# Shatz v. Raiser.

Jan. 27, 1942.

Davis, Boehl, Viser & Marcus for appellant.

James T. Robertson for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

The appellant has appealed from a judgment of $5,680 rendered against him in the Jefferson Circuit Court in favor of appellee for personal injuries, loss of

time, wages, doctors' bills, etc., which appellee sustained as a result of being struck by appellant's automobile at Shelby and Walnut Streets in the city of Louisville.

Appellant insists upon a reversal of the judgment on the grounds that (a) the evidence was insufficient to take the case to the jury or to sustain the verdict; (b) that the court improperly instructed the jury; and (c) the damages awarded appellee are excessive. We will discuss the issues in the order named.

The petition alleges negligence on the part of appellant in the operation of his automobile. The answer traverses the material allegations of the petition and pleads contributory negligence on the part of appellee.

Appellee testified that on the morning of May 20, 1939, she approached the intersection of Shelby and Walnut Streets intending to catch a Walnut Street car and looked up Walnut Street for a car but saw none and she then started across the street to catch the Shelby Street car. On being asked to tell the jury in her own words what happened, she testified as follows:

"A. Well, I started to cross to catch the Shelby Street car going south. I waved at the conductor while I was here on the corner there before I started across the street, and I looked both ways for traffic. I saw this car stopping on the other side of Walnut Street. It was still.

"Q. Where was it in the street? A. The first cartrack—the north cartrack. It was just a wheel on each side of the track.

"Q. Could you see the driver? A. Yes, sir.

"Q. What did you notice about him, if anything? A. Well, he was sitting there looking over towards this building project. There was some steam shovels working over there."

She further testified that she waved at the street car conductor indicating her desire to board the street car, and started across the street, and when she left the curb appellant's car was standing still at the approach of the intersection, and after she stepped over the first car track she heard appellant's car and looked and saw it coming, and she undertook to get out of the way, but it struck her while in the middle of the north-bound street car track. She said there was nothing to prevent appel-

lant from seeing her as she walked out into the street; that there were white stripes across the street indicating the walkway for pedestrians and she was walking between these stripes; that appellant did not blow his horn, and the only thing that attracted her attention was the noise of the approaching car, which was so near her that she could not get out of its path. She then described her injuries which we will discuss in our review of the issue of whether or not the damages are excessive.

Charles Mann, who saw the accident, was asked to tell the jury what he saw and observed, and he answered:

"I was standing on the corner. Mrs. Raiser come walking up to the corner—I don't know from which direction—and started across to the west side of Shelby street, as a streetcar had approached, as if she was going to catch the streetcar. In fact, I believe she was; and when she started across, I looked out south on Shelby Street and I saw an automobile approaching. In the meantime, I figured she was going to get hit. The automobile came right on up without making any check at all, and struck Mrs. Raiser and knocked her about six or eight feet."

"Q. Where was she when she was struck? A. On the crosswalk."

He further said that when appellee left the curb appellant's automobile was on the south side of Shelby Street and had not gotten into the intersection; that appellant was operating his car at a speed of 15 or 20 miles an hour; that there was a space of about ten or twelve feet between the sidewalk and appellee, which was sufficient to swerve a car and pass without striking anyone on the car tracks where appellee was struck; that appellant did not slow his car but little before he struck appellee and it "rolled right up to her," and went about six feet after it struck her; that there was nothing to prevent the driver of appellant's car from seeing appellee when she left the curb; that when he first noticed appellant's car it was in motion and he did not know whether or not it stopped at the point where appellee said she saw it before she started across the street.

Ray Griffith, another witness for appellee, testified as follows:

"Q. Where were you at the time of the acci-

dent? A. I was standing on the southwest corner of Shelby and Walnut.

"Q. What did you see? What happened? Just tell the jury in your own words? A. Well, I was standing on the corner about nine o'clock. A Shelby street car was coming out Shelby, going south on Shelby. I looked across the street, there was a lady; she was coming, I think, down Walnut, I am not sure. She stepped off the curbing there, and she got a few feet out, and the car hit her.

"Q. Where was she when she was hit? A. Well, she was in the crosswalk there going across to catch that car.

"Q. In the regular crosswalk? A. That is right.

"Q. Did you hear any horn blow before she was hit? A. No, sir; I did not.

"Q. When did you first see the car that hit her? * * * A. He was crossing the intersection.

"Q. Did you notice particularly both Mrs. Raiser and the driver of that car? ·A. I did.

"Q. What did you notice, if anything, about the driver of the car? A. Well, he was not paying any attention which way he was going. He was looking west on Walnut."

The witness further said that there was a housing project under construction and that appellant was looking in that direction, apparently observing the work which was in progress, and was not looking in front of him or where he was going, and that his car was running at about 20 miles an hour and appellee was knocked six or eight feet by the impact.

Carl Vetter, who also saw the accident, gave this testimony:

"I saw this lady step off the curb and start across the street. I saw this automobile just about that time. There was a pie truck there at the saloon there delivering some pies. I saw this car going across the street, and this lady was going to catch this streetcar."

"Q. When Mrs. Raiser stepped off the curbing

out into the street, where was the Shatz automobile? A. I could not say exactly. It was just passing the truck. The truck blocked the view. He was just started, going by, when she stepped off. I made a statement to some man that was standing there—I said this is a bad corner, liable to be an accident around here at any time. Just about that time, he hit the lady."

The witness further said that appellee was on the crosswalk when she was struck by appellant's car. He was asked if he noticed the driver of appellant's car when approaching the place of the accident, and he said:

"It looked like he was looking over there watching that project."

He was asked and answered as follows:

"Q. Did he slow down before he hit her? A. Just before he hit her. I imagine he had seen her when he was right up on her and tried to slow down."

He was asked if appellant's car stopped at or near the intersection, as testified to by appellee, and he said he could not say because his view was blocked by a truck and appellant's car was out in Walnut Street and in motion when he observed it. On cross-examination the witness was asked about how many steps appellee had taken after she stepped off the curb and before she was struck by appellant's car, and he said she had taken about ten steps.

Appellant was called as a witness in behalf of appellee as if on cross-examination. He was asked and answered these questions:

"Q. Mr. Shatz, how far away from the point of impact were you when you saw Mrs. Raiser leave the curbing? * * * A. She was almost at me when I stopped—just jumped out. I was almost stopped. She stepped right in front of me. * * * I was about across the pathway where the pedestrians pass. I was about—almost across it. Immediately she stepped, that quick, off the sidewalk, right in front of the bumper—just dashed out just as fast as I got to that point. I don't think there was three or four feet. She stepped right in front of my bumper. I was practically almost at a standstill.

"Q. When she was on that corner and stepped off, how far were you from the spot where the collision occurred? A. Not over two or three feet at the most.

"Q. How fast were you going? A. I will say between ten and fifteen miles an hour at the most—not over that."

It appears that appellant's deposition had been taken before the trial and he was asked if he did not state in the deposition that he saw the white lines indicating the walkway across the street for pedestrians, and he said that he made that answer as near as he could remember but he did not remember at the time he was testifying before the jury whether or not the lines were there. He was asked about other answers made in response to questions asked him in the deposition he had previously given, and he admitted making those answers, many of which apparently were contradictory to this evidence given before the jury. Appellant was further asked whether or not he stopped his car before he started across the street at the intersection, and he answered:

"I don't recall. I looked up—I looked both ways."

"Q. Did you stop or did you not stop? A. I don't recall."

He was then asked if he did not state in his previous deposition that he stopped, and he said "I was practically stopped—very slowly—barely moving."

At the close of the evidence for appellee, appellant testified in his own behalf, and he again said that he saw appellee just as she dashed out into the street in front of his car and he did everything he thought would be safe to keep from hitting her, and that he had no chance to turn or go around her because it all happened so quickly. Later, on cross-examination, appellant was asked if he stopped his car on the south side of Walnut Street before he entered the intersection, and he said he stopped and looked for traffic. He said later:

"I stopped, changed gears—shifted gears, practically at a standstill, when I looked both ways and I saw the traffic clear and proceeded."

It is thus seen that appellant substantially corroborates appellee in her statement that she saw him stop or saw

his car standing still before she started to cross the street. It is insisted for appellee that since she saw appellant's car come to a stop, she had the right to assume that it was safe for her to proceed across the street between the white lines on the walk for pedestrians, and she was not guilty of contributory negligence in attempting to cross the street in those circumstances.

Other witnesses testified for appellant and their evidence is somewhat favorable to him. Ishmael Meredith, the street car conductor, testified that he saw appellee wave or signal to him indicating that she desired to board the street car, and he was looking at her all the time but he did not see her look either way for traffic, but that he did not see appellant's car until it struck her. However, Meredith's testimony does not materially militate against that of appellee in her statement that she did look for traffic before she left the curb. According to the evidence of other witnesses for appellant, appellee stepped off the curb in front of appellant's car and within a few feet of it. It is thus seen that the evidence on the question of negligence and contributory negligence on the part of the respective parties is conflicting, there being substantial and probative evidence in favor of the contentions of the respective parties which was a question for the jury. Under the facts presented it follows that the evidence is sufficient to support the jury's finding on the question of negligence of appellant and contributory negligence of appellee, which were submitted to the jury by appropriate instructions.

It is next insisted that if the case should have been submitted to the jury at all, it should have been submitted only under the last clear chance doctrine, which instruction was offered by appellant as follows:

"You will find for the defendant unless you believe from the evidence that the driver of the car failed to exercise ordinary care to avoid injuring plaintiff after he discovered, or by the exercise of ordinary care could have discovered, her peril, in which event you will find for plaintiff."

This instruction assumes that appellee was guilty of contributory negligence as a matter of law. The conclusions we reached on the evidence, as indicated above, is conclusive of this question in favor of appellee since, as we have pointed out, the evidence was sufficient to sus-

tain the verdict on that issue. The court instructed the jury in the usual form on the question of contributory negligence and we think this instruction is all that was necessary to be given on that question.

At or near the close of the evidence the court permitted appellee to file an amended petition alleging, in substance, that as a result of appellee's injuries she lost 47 weeks' wages and asked to recover for this loss of time and wages. Appellant insists that the court should not have permitted the filing of the amended petition. It is the rule, with rare exceptions, that parties will be allowed to amend their pleadings to conform to the proof. Since there was evidence tending to show that appellee did lose 47 weeks' time and wages as a result of her injuries, we do not think the court abused a sound discretion in permitting the amended petition to be filed.

It is also insisted that the court gave the wrong measure of damages on the question of loss of wages. The instructions based this item of damages upon $17 per week. The alleged error is that appellee testified that she earned an average of $16 per week and the court should have fixed this sum as a basis or measure of damages, rather than $17 per week. Appellee was asked to state her weekly earnings and she said: "I will say $16 a week." She was then presented the pay envelopes showing the exact amount of her weekly earnings for various weeks during the latter part of 1936 and also for the years 1937 and 1938. It is disclosed, and not disputed, that her weekly wages averaged $17.45 a week. It thus appears that appellee's statement that her earnings were $16 per week was a mere estimate from memory, but the pay envelopes show conclusively that her average weekly earnings were in fact more than $17 per week. It follows that the court committed no error by this instruction.

We now come to a consideration of the question of whether the aggregate sum in damages allowed by the jury is excessive. This requires a review of the evidence relating to appellee's injuries. The evidence of appellee describing her various multiple injuries is voluminous and we will not attempt to state all the details. It is to be noted that the trial was approximately eleven months after the injury. She said she had a blue spot behind her right ear and injury to her side, and the doctor told her that her ribs were broken; that her right

knee was bruised very badly and the injury extended down almost to her ankle; that her heel was severely injured and still hurt her very badly; that her ankle was sprained and her leg was almost solid blue and bruised up to her knee, and her knee was strained. She also said that there were various bruises and blue spots on her thigh about six inches long and four or five inches wide; that her chest was mashed or crushed and still sore, and a blue streak extended around her left side; that her finger and hand were bruised and still hurt her; that her elbow was cut and sewed up at the hospital; that both knees were bruised and skinned and she also had an injury to her back which is also still sore, extending up between her shoulders, and an injury to her neck which was still sore and hurt her, and an injury on the top of her head.

She further testified that there was an injury to her side which she described as being "all puffed out, and when I go to walk, I have to hold my hand there a lot of the time so I can walk; and then this knee, it gives away on me. It gives way like this, and I almost fall." She still had her knee bandaged very tightly. She said there was a scraping or grating noise in the knee joint when she moved her foot or leg, the noise was audible and could be heard by the jury when she flexed her knee, and her knee and ankle were still tender and sore. She was still wearing a brace on the ankle and knee and could scarcely walk without the one on her knee. She said this condition of her ankle and knee, nor any of the injuries described, existed before she was injured. She said she had a noise in her head that almost drives her frantic, and she still had a throbbing in her head and had fainting spells which required her to lie in bed for two or three days at a time, and she was very nervous. She also complained of being numb on her left side. She said the puffed place on her side began hurting her about three days after the accident. As will be seen later, from the evidence of the doctors, the injury to her side is a potential rupture.

Dr. Oliver Knight testified that appellee had been a patient of his for about two years, which was more than a year before the accident here involved. He was asked about appellee's general condition before the accident and he said she was complaining of nervousness but with that exception she was in good physical condition. He

said he was called to see her on May 22, 1939, two days after the accident. She had then left the hospital and was at her home. He said she had a bruise and sore on the top of her head, bruised behind the right ear, the eighth and ninth ribs were bruised and he thought the ninth rib was cracked because it was very tender and awfully sensitive and had to be put up in adhesive. He said her right hand and wrist were skinned and bruised; right knee skinned and discoloration around the joint of each side of the patella, and bruises down the curve of the leg and right ankle; her sternum on the left side was bruised and painful; her left hand, forearm and wrist were sprained and her left leg had a cut three inches long—three stitches in it; her arm was discolored from the elbow to the shoulder; there was a bruise on her back and lower dorsal spine the size of a hand and very tender on pressure; the left crest of the ilium and hip had a large bruised area extending over about one-half the area of the hip on the left side over the hip joint; her right thigh was bruised and discolored from the knee to the hip and the inner side of the thigh was very painful and tender on pressure, indicating a deep clot down at the inside; her right knee was swollen to twice its normal size and the calf of her leg was skinned, bruised and discolored from the knee to the ankle, and her ankle joint and heel were sprained and swollen to twice their normal size.

In reference to the injury to appellee's side, the doctor testified that it was a potential rupture because the internal ring is much larger and has grown larger since the accident and she has a lot of difficulty on that side. He said that such injuries do not heal themselves but gradually grow worse and is a permanent condition. The doctor further testified that he had recommended X-rays of appellee's injuries to be taken, and described what the X-rays disclosed. He said she has a hypertrophic arthritis in the knees, a condition which she did not have before the accident. He said he noticed the crepitation or grating noise in appellee's knee joints about the fifth or sixth week after she could get up, and this condition was getting worse. He further said she had a spur on the inner side of the kneecap, on the posterior surface, next to the joint, and some spurs appearing on the joint of the tibia, and that there was some injury which had destroyed the cartilaginous tissue around the joint, and an effusion of tissue which becomes ossified into bone.

He further said that she had to have a sedative almost all the time to keep her quiet on account of her nervous condition which became increased since the accident and had gotten worse all along. He further testified that the injury to appellee's knees is permanent. He said there had not been any X-ray made of appellee's hip since the one made at the hospital, but he believed that spurs would develop all around the hip joint and hinder the moving of that joint.

Dr. George F. Dwyer testified that he made an examination and X-ray picture of appellee in October, 1939, which was about five months after the accident. He said that she gave him a history of the accident and detailed to him the various injuries she received, which appears to be about the same as given by her in her testimony. Dr. Dwyer said that the scars were yet present, indicating that she received the injuries described by her. He described the condition of her knees and found the same crepitation or grating, grinding noise as testified to by Dr. Knight. Briefly stated, his evidence corroborated Dr. Knight practically in all respects. He said there was no question about the injuries to her knee joints and perhaps other injuries being permanent, and very probably would continue to grow worse. Appellee was 56 years old at the time she received the injuries involved and 57 at the time of the trial. The doctors seem to be of the opinion that because of her age it is very unlikely that there will be any appreciable improvement in her condition. Appellant offered no medical testimony and the evidence of Drs. Knight and Dwyer is undisputed.

It is shown that appellee had an expectancy under the statute of 17.4 years, and assuming that she would have worked until she was 65 her earnings would have amounted to $6,656, based upon her average weekly earnings at the time and previous to the accident. It appears that appellee had resumed her work but she could not do the same kind of work and suffered pain and inconvenience in the performance of her duties because of her injuries.

If the whole amount of the judgment were for personal injuries only, a different question might be presented. It must not be forgotten, however, that under the evidence and instructions the jury might have found $799 special damages for the loss of wages for 47 weeks, and it also appears that at the time of the trial appellee's

hospital bills, doctors' bills, drug store bills, and other expenses incurred in the treatment of her injuries, were in excess of $1,000, and further, it is reasonably probable that she will continue to incur expenses for medicine and treatment for her injuries, since it is apparent from the undisputed evidence that she still takes medicine and her expenses are not yet ended.

Appellant cites certain cases to support his contention wherein the court held the damages allowed in those cases were excessive, and insists that they are in point with the present case. We have examined those authorities and find that in most of them it appeared that no permanent injuries were suffered, whereas in the case at bar the undisputed facts show that a number of appellee's injuries are permanent, particularly the injury to her side and the condition of her knee joints and the hip joint. We are constrained to the conclusion, therefore, that the damages allowed are not excessive.

Finding no error prejudicial to the substantial rights of appellant, the judgment is affirmed.